**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Criminal Case No. 20-cr-027-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

LEON SHANE SALAZAR,

      Defendant.

---

**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS AND FOR *FRANKS*
HEARING, AND GRANTING ENDS-OF-JUSTICE CONTINUANCE
ON THE COURT'S OWN MOTION**

---

The Government charges Defendant Leon Salazar with two counts of being a felon in possession of a firearm and/or ammunition, in violation of 18 U.S.C. § 922(g)(1). These two counts arose from two separate occasions, about a month apart, when the Colorado Springs Police Department discovered firearms and ammunition while executing search warrants on properties believed to be associated with Salazar.

Currently before the Court is Salazar's Motion to Suppress and for *Franks* Hearing. (ECF No. 21.) The Court finds that no hearing is needed. For the reasons explained below, the Court denies the motion. Moreover, in light of COVID-19, which currently makes a jury trial impossible, the Court on its own motion will exclude 60 days from the Speedy Trial clock.

## I.  LEGAL STANDARD

### A.  Burden of Proof

"Generally, if the search or seizure was pursuant to a warrant, the defendant has the burden of [proving that the Government violated the Fourth Amendment]."  *United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994) (internal quotation marks omitted).  Salazar has offered no argument why the general rule does not apply in this case, nor is the Court aware of any possible argument.  Accordingly, Salazar bears the burden here.

### B.  Deferential Review of Warrants

The Court's duty

> is to ensure that the magistrate judge had a substantial basis for concluding that the affidavit in support of the warrant established probable cause.  The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit there is a fair probability that contraband or evidence of a crime will be found in a particular place.

> Because of the strong preference for searches conducted pursuant to a warrant, the Supreme Court has instructed [lower courts] to pay great deference to a magistrate judge's determination of probable cause.  Only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.  The test is whether the facts presented in the affidavit would warrant a [person] of reasonable caution to believe that evidence of a crime will be found at the place to be searched.

*United States v. Nolan*, 199 F.3d 1180, 1182–83 (10th Cir. 1999) (internal quotation marks and citations omitted; some alterations incorporated).

### C.  *Franks*

A defendant who wishes a reviewing court to consider evidence outside what the warrant-issuing court considered must bring a *Franks* challenge, named for *Franks v.*

*Delaware*, 438 U.S. 154 (1978). *Franks* held that a defendant may be entitled to a preliminary evidentiary hearing to challenge the truthfulness of statements in an affidavit sworn out in support of a warrant. *Id.* at 155–56. To obtain a *Franks* hearing, the defendant must make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Id.* at 155–56; *see also United States v. Owens*, 882 F.2d 1493, 1499 (10th Cir. 1989) ("It is not enough to show . . . that an affiant's negligence or innocent mistake resulted in false statements in the affidavit."). The defendant must also make a substantial preliminary showing that "the affidavit, purged of its falsities, would not be sufficient to support a finding of probable cause." *United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997). And "the standards of deliberate falsehood and reckless disregard set forth in *Franks* apply to material omissions, as well as affirmative falsehoods." *Id.* (internal quotation marks omitted).

The Court's task, whether on the face of the pleadings or on the facts as established after a *Franks* hearing, is to reconstruct the warrant as it should have been and then decide whether probable cause existed:

> If an arrest warrant affidavit contains false statements, the existence of probable cause is determined by setting aside the false information and reviewing the remaining contents of the affidavit. Where information has been omitted from an affidavit, we determine the existence of probable cause by examining the affidavit as if the omitted information had been included and inquiring if the affidavit would still have given rise to probable cause for the warrant.

*Taylor v. Meacham*, 82 F.3d 1556, 1562 (10th Cir. 1996) (internal quotation marks and citation omitted).

## II.  THE FIRST WARRANT (STORAGE UNIT)

### A.   Background

On October 1, 2019, Colorado Springs Police Detective Brady Mitts applied for a

warrant to search a storage unit, representing as follows in his affidavit ("First Affidavit"):

> While on routine patrol in the area of Mallard Drive and
> Chelton Road [in Colorado Springs], Your Affiant observed a
> gray Buick Sedan bearing Colorado license plate JQQ231
> proceed past the posted stop sign from eastbound Mallard
> Drive, turning north onto Chelton Road.  Your Affiant ran a
> records check on this plate, and found that the registration
> expired 05/2019, though the vehicle displayed 11/2019 tags.
> Your Affiant also found that In Call For Service #1944377S,
> dated 09/27/2019, a traffic stop was attempted on this
> vehicle but the vehicle fled and the driver was not identified.
>
> Your Affiant radioed other members of the CSPD Gang Unit
> to move towards my location to assist when a traffic stop
> would be attempted.  Your Affiant followed the vehicle until it
> turned into the AAA Platte Self Storage, located at 4510
> Edison Avenue.  As the vehicle turned in, Your Affiant
> attempted a traffic stop by turning on overhead lights and the
> emergency siren.  The vehicle continued through the lot until
> it came to the secure access gate for the storage units.  At
> that time, a bald, Hispanic male wearing a black shirt and
> shorts exited the driver seat and immediately began running
> westbound from the vehicle.  This suspect was observed by
> witnesses getting into a different vehicle and fleeing the
> scene, and has not yet been located.
>
> A Hispanic female exited the front passenger seat
> immediately as well, though she remained with the vehicle
> as Your Affiant yelled at her to stay put.  This female was
> detained, and later identified as Ashley Trujillo, DOB:
> [REDACTED].  Ashley initially stated that she only knew the
> driver as "Steve", but she eventually confirmed his name
> was Leon.  Ashley stated Leon picked her up at her address
> off Mallard Drive, and was going to stop by his storage unit
> at this location, before taking her to another location.  Ashley
> stated that he threw a methamphetamine pipe at her before
> he took off running, and told her to run as well.  Your Affiant
> would note that both Ashley and Leon are listed as
> Associates of the same street gang, "Park Side Varrio".

Your Affiant later spoke with employees at this storage unit, who confirmed that they recognized the male associated with the vehicle that was stopped. They stated that he had a storage unit at this location. Your Affiant requested information about this person, and they provided documentation showing Unit HH34 is rented to Leon Salazar, DOB: [REDACTED]. These records included a copy of his Colorado Identification Card, which Your Affiant observed. The male in this picture was similar in appearance to the driver that fled the scene.

One employee, Kevin Denehan, stated that the male associated [with] the car that was stopped was acting suspicious around the unit the suspect rented. Your Affiant asked what he meant, and he shared that he thought the suspect was "running girls" from this unit, as he had previously observed an unknown female and unknown male emerge from the unit. He also noted that the suspect has taken several girls back to the unit before. Kevin believed that the female [whom] officers had detained [*i.e.*, Trujillo] may be one of the girls that he frequently brings back to his storage unit. Kevin stated that he has observed the inside of the unit previously, and saw car parts and boxes, but nothing immediately obvious as contraband.

Your Affiant was later approached by a citizen who shared his appreciation that we stopped the male that had been acting suspicious around the storage unit. This male, identified as Darryl Shores, DOB: [REDACTED], stated that he knew there was something going on with the male associated to the vehicle Your Affiant had stopped. Darryl advised that he did not know the suspect by name, but confirmed he was a Hispanic male with a shaved head. Your Affiant showed Darryl the copy of the Identification Card while hiding the name and identifying information on it, and Darryl positively identified Leon as the male associated with the vehicle Your Affiant stopped and [with] a unit in the HH portion of the complex.

Darryl advised that he had seen the suspect acting suspicious, and believed he may be involved in stolen vehicles based on the different vehicles he'd seen associated [with] the suspect. It should be noted that Kevin, Darryl, and another employee, Roman Gray, believe that Leon was associated [with] criminal activity and was believed to be involved in such criminal activity at his storage unit, though they struggled to describe exactly what kind of

activity they observed.  In Your Affiant's training and experience, citizens often report suspicious activity which is directly related to criminal activity, though they are not always able to articulate the crimes they believe such suspects are engaged in.

Your Affiant also located Call For service 19423235, which is associated to the vehicle stopped, as the license plate JQQ231 had been run on this call as well.  During this call for a suspicious vehicle dated 09/15/2019, Leon Salazar was run by officers on the call less than one minute after running the license plate JQQ231, though no further details are provided.

During a search of the vehicle Leon fled from, Detectives located a white plastic container in a black pouch on the driver's seat.  This white plastic container contained a crystalline substance suspected to be methamphetamine. Detectives later tested this substance at the Sand Creek Substation, and received a presumptive positive test for methamphetamine.  The substance and container had an approximate weight of 39.71 grams.  A scale was located in the same pouch, with a white powder residue.  Two pipes commonly used to smoke methamphetamine were located as well.

Employees at the AAA Platte Self Storage confirmed that Leon rented Unit HH34. . . .

Based on the totality of the circumstances, to include: an attempted traffic stop just four days prior where the driver fled, the vehicle displaying fraudulent registration stickers, Leon running from this traffic stop on foot, both Leon and Ashley being associates of the "Park Side Varrio" street gang, the narcotics and paraphernalia located in the vehicle, and the observations by citizens and employees of the storage unit that Leon is involved in criminal activity, Your Affiant respectfully requests to search the storage unit rented to Leon Salazar for the items listed in Attachment "B".

(ECF No. 30 at 5–7.)[1]

The cross-referenced Attachment B sought authority to search for and seize the

---

[1] All ECF page citations are to the page number in the CM/ECF header, which does not always match the document's internal pagination, particularly in exhibits with unnumbered cover pages.

following:

### GENERAL INFO

- General photographs of the scene

- Indicia of ownership of the unit

- Identification which would identify any occupants or visitors to the storage unit

### DRUGS AND/OR NARCOTICS

- Any and all illegal narcotics, to include but not limited to methamphetamine;

- All items to have been determined to have been used for transportation, storage, processing, sale, or use of illegal drugs, to include safes and lockboxes;

- All US currency determined to be proceeds of illegal narcotic transactions;

- All weapons, to include firearms, explosives and other dangerous weapons in close proximity to any found narcotics or possessed for the purpose of safeguarding narcotics or proceeds from narcotics;

- All records, to include but not limited to notebooks, personal diaries, client lists, address books, phone directories or scraps of paper that reflect drug transactions;

- All police scanners or any other counter surveillance equipment commonly used by individuals who are involved in illicit drug trafficking;

- All bank records indicating income or expenditures of funds relating to narcotics sales;

- Any safe deposit box keys or documents indicating possession of such;

- Any paperwork reflecting the rental of another storage locker or other rental facility in which narcotics could be stored;

- Any digital communication device that could be used to

facilitate illicit drug trafficking

STOLEN VEHICLE(S)/PART(S)

- Any and all vehicles and/or vehicle parts suspected to be stolen

- Any and all documentation to vehicles and/or vehicle parts suspected to be stolen

PROSTITUTION/PIMPING

- Any and all documentation associated to prostitution and/or pimping

- All US currency determined to be proceeds of prostitution and/or pimping

GANG

- Gang indicia: photographs, written material depicting gang association

- Any audio or videotapes depicting any gang involvement

- Any clothing which has been altered to show gang involvement

(*Id.* at 8–9.)

A state court magistrate approved Mitts's warrant application without changes ("First Warrant"). (*Id.* at 3.) Officers executed the First Warrant sometime between October 1 and 4, 2019—the precise date is unclear on this record, but also immaterial. (*See* ECF No. 30-1 at 6.) Inside the storage unit, officers discovered two firearms (one reported stolen, one lacking a serial number), a significant amount of ammunition, and drug paraphernalia. (*Id.*) One or both firearms, and/or the ammunition, forms the basis of Count 1 of the Indictment. (ECF No. 1 at 1; ECF No. 25 at 1.)

**B.**     **Analysis**

1.     <u>Facial Challenge</u>

Salazar says that probable cause was lacking on the face of the First Affidavit for any of the three crimes asserted as a basis for searching the storage unit: drug distribution, theft of cars or car parts, or prostitution/pimping.  (ECF No. 21 at 5–7.)[2] Under the circumstances, Salazar must indeed knock out probable cause for all three suspected crimes.  Salazar nowhere argues that the items for which the First Warrant authorizes search and seizure are inappropriate as compared to the suspected crimes. It is obvious, moreover, that any one of those crime-specific groupings of items would have allowed agents to search everywhere, and inside every container, within the storage unit.  Thus, if probable cause existed as to any one of the three suspected crimes, agents could validly search the storage unit from top to bottom, and the discovery of firearms and ammunition would be valid under the plain view doctrine. *See, e.g.*, *United States v. Brown*, 984 F.2d 1074, 1077 (10th Cir. 1993) ("The infirmity of part of a warrant requires the suppression of evidence seized pursuant to that part of the warrant, but does not require the suppression of anything described in the valid portions of the warrant (or lawfully seized—on plain view grounds, for example—during their execution)." (internal quotation marks omitted; alterations incorporated)).

The question, then, is whether the First Affidavit established probable cause to suspect evidence of any of the three crimes contemplated there, *i.e.*, drug distribution, theft of cars or car parts, or prostitution/pimping.  As it turns out, the Court need only

---

[2] The First Warrant also authorized a search for gang-related evidence, but the Government does not argue that gang association is a crime, and Salazar similarly makes no argument about the effect of this portion of the warrant.  Accordingly, the Court too will ignore it.

discuss drug distribution.

Salazar argues, "While there was probable cause to believe that [he] had possessed methamphetamine *in his car*, the affidavit did not provide a nexus between the crime of drug possession and the storage unit." (ECF No. 21 at 5 (emphasis in original).) Salazar says that such a "nexus" often comes by way of the officer-affiant's opinion that, based on his or her experience, "evidence of a specific crime is likely to be found in a specific location." (*Id.* at 6.) Mitts offered no such opinion, and, in Salazar's view, no other reason to believe that officers might find drugs in the storage unit, thus invalidating the warrant as to searches for evidence of drug crimes. (*Id.*)

Again, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). This Court's duty "is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Id.* at 238–39 (internal quotation marks omitted; alterations incorporated).

"In determining whether or not probable cause exists to believe that evidence of a crime will be found at the place to be searched, the magistrate is entitled to rely upon practical considerations of everyday life." *Anthony v. United States*, 667 F.2d 870, 874 (10th Cir. 1981). Thus, "the issuing magistrate judge may draw reasonable inferences from the material provided in the warrant application." *Nolan*, 199 F.3d at 1183 (internal quotation marks omitted). Or, in other words, "the nexus between the place to be searched and the evidence sought may be established through normal inferences about

the location of evidence." *United States v. Gant*, 759 F.2d 484, 488 (5th Cir. 1985),

*quoted with approval in United States v. Tisdale*, 248 F.3d 964, 971 (10th Cir. 2001).

A "minimal nexus" is enough. *United States v. Henderson*, 595 F.3d 1198, 1202 (10th

Cir. 2010).

Here, the Court finds that the following assertions from the First Affidavit to be

particularly relevant:

- Salazar drove the car up to the entrance gate of a storage unit complex;

- Salazar then fled the scene on foot;

- Salazar indeed rented a storage unit in that complex; and

- on the driver's seat of Salazar's car, the police found a pouch containing
  methamphetamine and a scale with apparent drug residue.

In this light, the magistrate could reasonably infer that Salazar was engaged in

drug distribution. Courts throughout the country, including the Tenth Circuit, have

recognized that scales are indicia of drug distribution, not just possession, especially

when found near drugs themselves. *See, e.g.*, *United States v. Druger*, 920 F.3d 567,

571 (8th Cir. 2019); *United States v. Sandoval*, 680 F. App'x 713, 717–18 (10th Cir.

2017); *United States v. Sandoval*, 615 F. App'x 242, 244 (5th Cir. 2015); *United States

v. Northington*, 519 F. App'x 795, 797 (4th Cir. 2013); *United States v. Spurgeon*, 117

F.3d 641, 644 (2d Cir. 1997); *Hubbard v. Dorsey*, 77 F.3d 492 (table), 1996 WL 67197,

at *1 (10th Cir. 1996).

Moreover, the magistrate could reasonably infer that a person headed to a

storage unit with drugs and a scale might store drugs in that unit—particularly a person

who flees the scene. In this regard, moreover, it is highly significant that Salazar finally

stopped—rather than pulling over on a random residential street, for example—in front of the security gate leading to the storage unit complex where he in fact rented a storage unit.  Thus, given his location at the moment Salazar stopped and fled the scene, the inference that he was headed specifically to his storage unit is strong—in fact, very strong—and one the magistrate could easily and lawfully make.

Accordingly, the Court finds that the First Affidavit provided the magistrate with a substantial basis for concluding that probable cause existed to suspect the crime of drug distribution, and that evidence of that crime would be found in the storage unit.

2.    Material Omissions

Salazar contends, however, that Mitts potentially fabricated one fact in the First Affidavit, and also omitted material information that would have affected the magistrate's probable cause determination.  (ECF No. 21 at 7–12.)  The Court will discuss each of Salazar's accusations in turn.[3]

Salazar first notes that Mitts informed the magistrate about a traffic stop attempted on Salazar's car the week before, in which the vehicle fled and the driver was not identified—whereas Mitts knew, but did not tell the magistrate, that the driver the previous week had been a black male who did not look like Salazar (a light-skinned Hispanic man).  (*Id.* at 8–9.)  Salazar thus argues that Mitts intentionally or recklessly created the impression that Salazar was the driver during the previous week's encounter.  But Salazar does not explain why this omission was material to the magistrate's probable cause determination, either about drug distribution or any other

_____

[3] Salazar's arguments largely rely on bodycam footage that has not been provided to the Court.  The Government does not contest Salazar's descriptions of what the bodycam footage shows.

crime.  Whether or not the magistrate had the impression that Salazar had fled from police the week before, there is no dispute that Salazar fled from Mitts at the entrance to the storage unit.  That alone, in combination with the other facts recounted above, was enough to establish a nexus between the storage unit and the crime of drug distribution.

Salazar next asserts that Mitts left out important information about Salazar's passenger, Ashley Trujillo.  In particular, Trujillo stepped out of Salazar's car holding a liquor bottle and wearing an ankle monitor, and she was distraught at the thought of her parole being revoked because she would be separated from her children.  (ECF No. 21 at 9–10.)  Moreover, she told Mitts that Salazar "threw two wrapped up meth pipes at her before running, at least one of which somehow managed to land inside her purse." (*Id.* at 9.)  It is not clear why Trujillo was talking about a methamphetamine pipe in her purse (*e.g.*, had Mitts searched her purse? or did Trujillo fear a search and so preemptively try to explain away what the search would find?).  Regardless, Mitts found Trujillo's story absurd.  Yet he informed the magistrate only that, according to Trujillo, Salazar had thrown a meth pipe at her—thus implicitly endorsing Trujillo's story (and making Salazar look more guilty of drug crimes) while not actually believing that story.

The Court agrees with Salazar that Mitts should have given the magistrate the full details about Trujillo's accusations against Salazar and her incentive to lie. However, had those details been included, this Court cannot say that the magistrate would have lacked a reasonable basis to authorize the police to search for evidence of drug distribution in the storage unit.  Again, Salazar was on his way to his storage unit and fled from police, leaving behind methamphetamine and a scale on his seat. Knowing that Trujillo had an incentive to lie and perhaps frame Salazar could have

prompted the magistrate to infer that perhaps the drugs and scale did not belong to Salazar, but "[t]he magistrate was not required to rule out every other possible alternative." *United States v. Shomo*, 786 F.2d 981, 984 (10th Cir. 1986).  Salazar fled the scene, not Trujillo.  Thus, even informed of Trujillo's incentive to lie, the magistrate would still have possessed a common-sense basis to conclude that the meth and scale belonged to Salazar, and in turn conclude (in light of the other relevant facts) that evidence of drug distribution would be found in the storage unit.

Salazar's third accusation that Mitts misled the magistrate relates to what Mitts reported from Darryl Shores, the citizen bystander who volunteered information.  Mitts said that Shores (i) identified Salazar as the renter of the relevant storage unit, (ii) stated that he had seen Salazar with multiple cars, and (iii) believed Salazar was involved in stolen vehicles.  However, in Mitts's bodycam footage, Shores is seen only conveying the first two items of information.  "Accordingly, it appears that Detective Mitts intentionally, or at least recklessly, misrepresented the witness's statement."  (ECF No. 21 at 10.)  This would be relevant, if at all, to probable cause to search for evidence of stolen vehicles or vehicle parts.  It is not relevant to probable cause as it relates to drug distribution.

Salazar's fourth and final accusation is that Mitts failed to tell the magistrate that Salazar's car—*i.e.*, the car from which Salazar fled at the gate of the storage unit complex—was, indeed, Salazar's car (*i.e.*, not stolen).  (*Id.*)  But, as with the previous accusation, this has no relevance to probable cause as it relates to drug distribution.

In short, even accepting Salazar's claims of material misstatements and omissions, the magistrate still could have found probable cause to authorize the First

Warrant as to the crime of drug distribution.  Accordingly, police officers validly

discovered the firearms and ammunition in the storage unit.

### III.  SECOND WARRANT (CAR SALAZAR WAS WORKING ON)

**A.     Background**

On November 1, 2019, Colorado Springs police located and arrested Salazar.

That day, Mitts applied for a warrant to search Salazar's residence, and a car parked

outside of his residence, representing as follows in his affidavit ("Second Affidavit"):

> On October 1, 2019, Your Affiant conducted a traffic stop on
> a gray Buick sedan bearing Colorado license plate JQQ231
> at the AAA Platte Self Storage, located at 4510 Edison
> Avenue.  The driver fled from the traffic stop, and was later
> identified as Leon Salazar, DOB: [REDACTED].  A female
> remained at the vehicle and was identified as Ashley Trujillo,
> DOB: [REDACTED].  Your Affiant would note that both
> Ashley and Leon are listed as associates of the same street
> gang, "Park Side Varrio".
>
> During a search of the vehicle Leon fled from, Detectives
> with the CSPD Gang Unit located a white plastic container in
> a black pouch on the driver's seat.  This white plastic
> container contained a crystalline substance suspected to be
> methamphetamine.  Detective K. Johnson/5410 later tested
> this substance at the Sand Creek Substation, and received a
> presumptive positive test for methamphetamine.  The
> substance and container had an approximate weight of
> 39.71 grams.  A scale was located in the same pouch, with a
> white powder residue.  Two pipes commonly used to smoke
> methamphetamine were located as well.
>
> Investigation following the traffic stop led to the discovery of
> a storage unit rented to Leon at the same storage unit facility
> the stop was conducted at.  Your Affiant received
> documentation from employees at the AAA Platte Self
> Storage showing that Leon rented unit HH34.  On October 1,
> 2019, Your Affiant applied for and was granted a Search
> Warrant for the storage unit rented to Leon by the Honorable
> Judge Burlingame.
>
> The subsequent search of this storage unit belonging to
> Leon located two firearms.  A Hi-Point 4595 rifle bearing

serial number R92694 was recovered with a live round in the chamber. This gun was reported stolen under CSPD Case Report 19-22639. In addition to the rifle, the report listed 12 gauge magazines which have not been recovered at this time. A single shot, bolt action .22 caliber Savage Arms 120A rifle was also located, though [t]his gun did not have a serial number. Ammunition was found throughout the storage unit, as well as a sling for a gun, and a holster for a handgun. Drug paraphernalia was also located, as well as indicia for Leon. The investigation led Your Affiant to submit an Arrest Warrant for Leon to the Honorable Judge S. Gerhart on October 4, 2019, which she signed. The charges on this Arrest Warrant included Possession of Weapons by Previous Offender and Unlawful Distribution, Manufacturing, Dispensing or Sale, among other charges.

Detectives with the Gang Unit worked to locate Leon, and received a tip from a Source of Information that Leon may be staying at a residence at 2183 Fernwood Drive, in Colorado Springs, Colorado. On November 1, 2019, Detective Johnson and Detective A. Hansen/4907 conducted surveillance on this residence. Detective Johnson observed a male he recognized as Leon working on a black Ford Taurus bearing Colorado license plate BTK556, which was parked in front of this residence.

Detectives approached the male on foot, and positively identified him as Leon. He was taken into custody on the warrant, and suspected methamphetamine was located on his person. Additionally, a set of keys were recovered from his person. Another resident at 2183 Fernwood Drive, Natalie Middlebrooks, DOB: [REDACTED] confirmed that Leon was staying at that house.

Detectives cleared the residence, and found that the same keys recovered from Leon's person unlocked a room identified by Natalie as belonging to Leon. Natalie also identified the black Taurus sedan that Leon was working on as the vehicle he had been using. A records check on this vehicle shows that it is registered to Brianna Crittenden, and that the vehicle is a 2002 Ford Taurus, black in color, bearing VIN: 1FAHP55S82G272043.

The Arrest Warrant for Leon included charges for Unlawful Distribution and Possession of Weapons by Previous Offender. Based on Your Affiant's training and experience, individuals involved in narcotics distribution often keep

> additional narcotics at their residence. Further, these individuals often keep firearms to protect their narcotics and the proceeds from the sales. Your Affiant knows that individuals involved in these crimes often keep ledgers or records of their sales, either in print form or through digital communication devices. These digital communication devices are also commonly used to arrange and facilitate the distribution of narcotics.
>
> * * *
>
> Your Affiant believes evidence found during a search of the residence at 2183 Fernwood Drive, and the black Ford Taurus bearing Colorado license plate BTK556 for the items listed in Attachment "B" would be crucial in the investigation into the charges listed on the Arrest Warrant signed by the Honorable Judge S. Gerhart for [Salazar].

(ECF No. 30-1 at 5–7.)

The cross-referenced Attachment B sought authority to search for and seize "general info," drug-related items, and gang-related evidence, just as in Attachment B to the First Warrant. (*Id.* at 8.) It also proposed to search for all firearms, ammunition, projectiles, shell casings, holsters, magazines, and documentation showing ownership, sale, or purchase of a firearm. (*Id.*) Lastly, it proposed to search for indicia of ownership of a vehicle, and vehicle registration papers. (*Id.*)

The magistrate approved Mitts's warrant application without changes ("Second Warrant"). (*Id.* at 3.) The search of the car revealed a firearm, ammunition, and more methamphetamine. The firearm and/or ammunition are the basis of Count 2 of the Indictment. (ECF No. 1 at 2; ECF No. 25 at 1.)

## B.   Analysis

### 1.   Fruit of the Poisonous Tree

Salazar challenges the Second Warrant only as it relates to the Ford Taurus parked in front of his residence, and particularly whether Mitts established a reason to

believe that evidence of a crime would be found in the car.  (ECF No. 21 at 12–14.)  But Salazar first argues that the Second Warrant was tainted by what Mitts learned when executing the allegedly unlawful First Warrant.  (*Id.* at 12–13.)

The Court has concluded that the First Warrant was not unlawful.  But even if it were, "[w]hen a warrant is tainted by some unconstitutionally obtained information, [the court should] nonetheless uphold the warrant if there was probable cause absent that information."  *United States v. Sims*, 428 F.3d 945, 954 (10th Cir. 2005).  Giving Salazar the benefit of the doubt, the Court will apply this approach.

Stripped of what Mitts learned from executing the First Warrant, the Second Affidavit informed the magistrate that:

- Salazar fled from the traffic stop at the storage unit complex;

- Salazar and his passenger in the car, Trujillo, are both associates of the same street gang;

- a search of the car from which Salazar fled located methamphetamine and a scale on the driver's seat;

- detectives received a tip that Salazar was residing at 2183 Fernwood Drive;

- detectives located Salazar at that address, where they saw him working on a black Ford Taurus parked in front of the residence;

- detectives arrested Salazar on the spot and located suspected methamphetamine on his person;

- another resident at that address, Middlebrooks, confirmed that Salazar was staying there;

- Middlebrooks identified the black Ford Taurus as the vehicle Salazar had been using;

- in Mitts's experience, persons involved in narcotics distribution often keep additional narcotics at their residences.

The Court agrees with the Government that, on the face of the Second Affidavit, the magistrate had more than enough to infer that drugs would be found in the Ford Taurus:

> The defendant fled from a traffic stop, abandoning a car that contained drugs and drug paraphernalia.  By so doing, the defendant proved that he has stored drugs and drug paraphernalia in his automobiles.  Additionally, the defendant had drug paraphernalia and narcotics on his person when he was arrested.  Those facts provided more than a sufficient nexus to search the car the defendant was working on at the time of his arrest.

(ECF No. 25 at 16.)  The Court would further emphasize that Salazar was found working on the car in front of his residence, not in front of, say, the registered owner's residence.

Salazar emphasizes that Mitts offered his opinion that drug dealers often keep additional drugs in their residences, but Mitts did not offer the same opinion about their cars.  (ECF No. 21 at 13.)  No such opinion was needed in this case.  The facts presented to the magistrate were adequate, by themselves, to find probable cause to search the car for drug-related evidence.

2.    Material Omissions

Salazar asserts, however, that Mitts misrepresented a crucial fact, and omitted material information, about Salazar's connection to the car.[4]  Specifically, the bodycam

---

[4] Although the Second Affidavit contains the same information from Trujillo that Salazar

footage shows Mitts questioning Middlebrooks as follows:

> The resident was asked, "Do you know this to be
> [Mr. Salazar's car] right here?"  She replied, "He said it was."
> However, she quickly went back on her statement and
> explained that she didn't actually know: "I don't know," she
> said.  "I don't know.  I really don't know. I can't testify on that
> at all."

(ECF No. 21 at 13–14 (alterations in original).)  Thus, Salazar argues that Mitts had no

basis to represent to the magistrate that he was told by Middlebrooks that the Ford

Taurus was the car Salazar had been "using."  (*Id.*)  Moreover, Mitts later "asked the

resident's grandson who was present whether 'that's what you've seen him drive?'  The

grandson responded, 'I haven't seen him, to be honest, I haven't seen him drive

nothing.'"  (*Id.* at 14.)  "Finally, the affidavit omitted that Mr. Salazar himself had

explained that the car was not his, and that he was fixing it for a friend."  (*Id.*)

    In response, the Government seems to commend Mitts for having said only that

Salazar "was using" the car, and for providing information that the car was registered to

someone else—apparently as opposed to saying that Salazar owned the car.  (ECF No.

25 at 17 ("[T]he affidavit was perfectly consistent with the information law enforcement

received. * * * If anything, the affidavit carefully couched the defendant's connection to

the car as one of recent use, without extending to the car's ownership.").)  But the

Government does not address the fact that Mitts had no basis to tell the magistrate that

Middlebrooks said Salazar "was using" the car.  Rather, the Government seems to be

arguing that Mitts was careful not to make a more significant misrepresentation

(ownership) than he was already making (Middlebrooks's claim of "use").  The argument

---

has argued was materially incomplete in the context of the First Affidavit, Salazar does not
reprise those arguments in the context of the Second Affidavit.

is nonsensical.

The Government adds, however, that Salazar "was surveilled in and around the car, and he had the keys to the car on his person.  Such facts sufficiently support the statement that he was <u>using</u> the vehicle, at least at the time of his arrest."  (ECF No. 25 at 17 (emphasis in original).)  There are two problems with this assertion.  First, the Second Affidavit nowhere says that Salazar had the keys *to the car* on his person.  It says only that he had keys on his person and that those keys unlocked a room *in the house.*  Second, the Second Affidavit nowhere claims that Salazar was, in fact, "using" the vehicle (*e.g.*, that the arresting officers saw him doing something other than work on it).  The Second Affidavit reports that Middlebrooks *said* that Salazar was "using" the car—with the obvious implication that, in Middlebrooks's eyes, Salazar was currently treating it as his own although he did not own it.

In short, the Court agrees with Salazar that Mitts improperly conveyed Middlebrooks's words to the magistrate.  The Court will further assume that this was a material misrepresentation, and that Middlebrooks's true words, along with the grandson's words and Salazar's words were all material omissions.  Assuming as much, the Court must examine whether probable cause would still have existed if Mitts had not represented Middlebrooks as saying that Salazar was using the car, and had instead accurately represented that (1) Middlebrooks, when asked by Mitts about ownership of the Ford Taurus, first said that Salazar "said it was [his]," but then quickly backtracked, (2) the grandson disclaimed knowledge either way, and (3) Salazar said he was working on the car for a friend.

Had the Second Affidavit been presented in this way, the magistrate would still

have had a substantial basis to find probable cause to search the car for evidence of drugs. Middlebrooks and the grandson were suspiciously equivocal. The magistrate could have reasonably inferred that they were likely covering for Salazar. As for Salazar's own story, the magistrate would not have been required to give it any credit under the circumstances. Salazar was known to have fled from police, thus showing a propensity to do anything (including saying anything) to avoid being found out. And, again, Salazar was working on the car in front of his own residence.

Thus, probable cause would have existed to issue the Second Warrant even under Salazar's view of what Mitts should and should not have said to the magistrate. The Second Warrant was therefore valid at least as to drug-related evidence. Because the search for that evidence would have allowed officers to search the entire car, the discovery of a gun and ammunition while performing that search was likewise valid.

## IV.  ENDS-OF-JUSTICE CONTINUANCE

Salazar's motion has tolled the Speedy Trial clock, and this disposition would normally cause the clock to begin running again. *See* 18 U.S.C. § 3161(h)(1)(D). According to the CM/ECF Speedy Trial calculator for Salazar's case, he has 43 days left of the 70-day Speedy Trial allowance, meaning his trial must commence no more than 43 days from today, *i.e.*, on or before June 27, 2020, absent further tolling or exclusion of time.

"As is well known, the novel coronavirus officially known as SARS-CoV-2, and the disease it causes, COVID-19, have led to a worldwide pandemic. The problem became especially acute in Colorado in mid-March 2020." *Essien v. Barr*, ___ F. Supp. 3d ___, ___, 2020 WL 1974761, at *1 (D. Colo. Apr. 24, 2020). Through a succession

22

of general orders, most recently General Order 2020-8, the District of Colorado has

continued all jury trials through at least July 6, 2020.[5]  Since jurors are generally

summoned to appear for civil and criminal jury trials to be held in the Arraj U.S.

Courthouse on Mondays, and given the terms of General Order 2020-8, the very

earliest date on which a jury could be assembled for a trial in this case would be

Monday, July 13, 2020.  Accordingly, the Court cannot convene a jury trial for Salazar

within the time remaining on the Speedy Trial clock.

   The Court may exclude from the Speedy Trial clock

> [a]ny period of delay resulting from a continuance granted by
> any judge on his own motion or at the request of the
> defendant or his counsel or at the request of the attorney for
> the Government, if the judge granted such continuance on
> the basis of his findings that the ends of justice served by
> taking such action outweigh the best interest of the public
> and the defendant in a speedy trial.

18 U.S.C. § 3161(h)(7)(A).  This is frequently referred to as an "ends-of-justice

continuance."  Of the factors the statute requires the Court to consider, *see id.*

§ 3161(h)(7)(B), only one is presently relevant: "[w]hether the failure to grant such a

continuance in the proceeding would be likely to make a continuation of such

proceeding impossible," *id.* § 3161(h)(7)(B)(i).

   With this in mind, the Court hereby makes and grants its own motion for an ends-

of-justice continuance.  The Court finds that General Order 2020-8 prevents the

convening of a jury trial.  Moreover, General Order 2020-8 reflects the reality of the

present situation in Colorado, namely, that it is probably unsafe to convene a jury at this

time.  Doing so would require the venire panel (usually thirty-plus persons) to

---

[5] *See* http://www.cod.uscourts.gov/Portals/0/Documents/Orders/GO_2020-
8_Continuation_of_Trials.pdf.

congregate together in the jury assembly room, and then in the undersigned's courtroom, for three or four hours, all of them breathing the same air, touching the same door handles, and so forth.  Then the empaneled jury (twelve persons, plus one or two alternates) would spend an estimated five days (*see* ECF No. 11) sitting close to each other in the jury box, meeting in the confines of the jury deliberation room, sharing the same restrooms, etc.  In other words, although the Speedy Trial Act presumes that it is in the public's best interest to bring a defendant to trial speedily, 18 U.S.C. § 3161(h)(7)(A), that is simply not the case under the circumstances.  Bringing the defendant to trial would instead create a danger to the public.

Even if the undersigned could make an exception to General Order 2020-8, the Court would likely need to send out hundreds of jury summonses to yield anything close to a normal-sized venire panel.  True, it is unlawful to ignore a jury summons, but the Court must account for present realities.  And those who *do* appear on the summons would almost certainly skew younger and less risk-averse (or more contemptuous of stay-at-home orders and similar directives), thus likely defeating all possibility of empaneling a jury that fairly represents the community.

For the foregoing reasons, the Court will impose an ends-of-justice continuance of 60 days.  As required by 18 U.S.C. § 3161(h)(7)(C), the Court has not predicated its ruling on general congestion of the Court's calendar or lack of diligent preparation by counsel.

Normally the Court would not impose an ends-of-justice continuance on its own motion without first giving the defendant and the Government an opportunity to respond.  However, the Court need not solicit such responses in this instance because the Court

cannot convene a jury before the Speedy Trial clock would otherwise expire.  Nor would the Court accept, at this relatively early stage in the proceedings, the argument that Salazar's interest in being brought to trial speedily (or else the charges dismissed) outweighs the Government's interest in enforcing the criminal laws.

The Court recognizes the possibility that circumstances may not change in the 60 additional days now excluded from the Speedy Trial clock, and in fact may persist for many months after that.  If that is the case, the Court will address the matter as it comes.

## V.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Salazar's Motion to Suppress and for *Franks* Hearing (ECF No. 21) is DENIED;

2. All days from today, to and including **July 14, 2020**, shall be excluded from the Speedy Trial clock; and

3. By separate order, the Court will reset the trial and related pretrial deadlines.

Dated this 15th day of May, 2020.

BY THE COURT:

William J. Martínez
United States District Judge